UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JIM ANGELO CONGIN, | ) | Case No.  1:08 CV 0249 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Jim Angelo Congin filed this appeal seeking judicial reversal under 42 U.S.C. §405 (g) from

the administrative denial of disability insurance benefits.  At issue is the ALJ's decision dated

August 21, 2006, which stands as the final decision of the Commissioner.  See 20 C.F.R. §404.1481.

The parties consented to the jurisdiction of the Magistrate Judge for all further proceedings including

entry of judgment in accordance with 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil

Procedure.

Congin, age 51 at the administrative hearing, became unemployed on June 5, 2005, following

the transfer of ownership of a family-owned business, and  applied for disability benefits on

September 8, 2005, alleging disability since June 5, 2005, due to anxiety disorder based on treatment

he had received during 1965 through 1995 (Tr. 43-47, 59-61, 71, 75-83, 149-51, 155-56).[1]  His

---

[1] As Congin explained the situation, Metco was owned by his father and a partner, until his father died and he
took over the business with his brother, with his brother controlling its operations. The business became nearly bankrupt
after several years and was sold.  One of the terms of sale was to retain Congin as a consultant for one-year. After the
contractual consulting period ended, Congin's contract was not renewed.

1:08 CV 0249                                        2

application was initially denied November 18, 2005, and denied on reconsideration January 9, 2006.

(Tr. 31-36). Beginning in January 2006, Congin sought mental health treatment and this continued

at least through June 2006. During this time period Congin saw psychologist Dr. Gerstenhaber and

psychiatrist Dr. Eden monthly for treatment of anxiety .(Tr. 131-42). In his July 2006 assessment,

Dr. Gerstenhaber diagnosed panic disorder, generalized anxiety disorder, elements of obsessive

compulsive disorder and social phobia .(Tr. 145). Dr. Gerstenhaber opined that there was "moderate"

restriction of ability to relate to others, "marked" restriction of daily activities, "marked" restriction

of ability to maintain concentration or attention, " marked" restriction of ability to sustain routine

without supervision, and "moderate" restriction of ability to perform activities within schedule .(Tr.

144). This psychologist further reported "severe" limitation of response to work pressures and

"marked" limitation of appropriate response to changes in work setting, performance of *complex*,

*repetitive* or *varied* tasks, and behaving in an emotionally stable manner .(Tr. 144-45). In his opinion,

Congin would be absent from work more than three times a month due to his mental impairment or

treatment. (Tr. 145).


        The ALJ found that Congin had severe impairments of panic disorder and generalized anxiety

disorder. (Tr. 12). Congin's application was denied based on the testimony of a vocational expert

in response to a hypothetical question to identify jobs restricted to simple, repetitive tasks with no

complex tasks and minimal interaction with public, co-workers, and supervisors .(Tr. 12, 170). The

expert identified jobs as housekeeping cleaner, small products assembler, and laundry worker. (Tr.

170). This testimony was adopted by the ALJ, and Congin was found not disabled. (Tr. 16-17).

1:08 CV 0249                    3

*Congin's Arguments*:

Congin challenges this determination contending:

1.  The ALJ failed to include the mental residual functional limitations articulated by two State agency psychologists in his residual functional capacity although he found those limitations to be "consistent with the overall evidence" and he stated that those function[s] had been "incorporated into the residual functional capacity reached herein."

2.  The ALJ failed to follow the Treating Physician Rule.

3.  The ALJ ignored the requirements of SSR 96-7p and 20 CFR §404.1529 (c)(3) by finding Plaintiff's allegations of disabling symptoms not credible. The ALJ selectively evaluated the evidence and misstated or ignored testimony and medical evidence.

*Standard of Review:*

"This court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997). The issue before this court must be resolved under the standard whether there is substantial evidence in the record to support the Commissioner's decision. Substantial evidence is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Secretary*, 974 F.2d 680, 683 (6th Cir. 1992); *Born v. Secretary*, 923 F.2d 1168, 1173 (6th Cir. 1990); and see *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (court may "not inquire whether the record could support a decision the other way").

1:08 CV 0249                                    4

Congin established that he cannot perform his past relevant work. Consequently, the burden

had shifted onto the Commissioner to demonstrate the existence of types of employment compatible

with the individual's disability. See *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Cole v.*

*Secretary*, 820 F.2d 768, 771 (6th Cir. 1987); *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990);

*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999).


*Failure to follow "treating physician rule":*

Beginning with the most serious flaw in the ALJ's decision, Congin argues that the ALJ

should have based the decision on Dr. Gerstenhaber's mental capacity assessment. What is at issue

here is whether the ALJ applied the correct legal standard in assessing what is a "medical opinion."

In determining the question of substantiality of the evidence, reports of physicians who have treated

the claimant over a long period of time are entitled to greater weight than the reports of physicians

employed by the government for the purpose of defending against a claim for disability. See 20

C.F.R. §404.1527(d)(2); §416.927(d)(2).; 20 C.F.R. §404.1527(d)(3); §416.927(d)(3). This is

commonly known as the treating physician rule. See *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d

234, 242 (6th Cir. 2007); *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544(6th Cir. 2004). The

ALJ must give the opinion from the treating source controlling weight if he finds the opinion "well-

supported by medically acceptable clinical and laboratory diagnostic techniques" and "not

inconsistent with the other substantial evidence in [the] case record." *Wilson v. Commissioner*, 378

F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. §404.1527(d)(2) and §416.927(d)(2). Reversal is

required when in rejecting a treating physician's opinion the ALJ failed to give "good reasons" for

not giving weight to that opinion. See *Wilson v. Commissioner of Soc. Sec.* 378 F.3d 541, 544 (6th

1:08 CV 0249                                        5

Cir. 2004). This requirement for articulated "good reason" has been long recognized since at least

SSR Rulings 96-2p and 96-5p, which require the ALJ to articulate specific legitimate reasons

supported by substantial evidence in the record that are sufficiently specific to make clear for

subsequent review the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight. The ALJ *must* apply the regulatory factors of this section when explaining

why the treating source was not accorded controlling weight. *Bowen v. Commissioner of Soc. Sec.*,

478 F.3d 742, 747 (6th Cir. 2007), citing *Wilson*, 378 F.3d at 544. "Specifically, § 404.1527(d) of the

[Social Security Administration]'s regulations prescribes that the ALJ is to consider (1) the length

of the treatment relationship and the frequency of examination, (2) the nature and extent of the

treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with

the record as a whole, and (5) the specialization of the treating source." *Bowen*, 478 F.3d at 747.

On the opposite end of the spectrum, the opinion from a non-examining physician should be given

little weight "if it is contrary to the opinion of the claimant's treating physician." *Shelman v. Heckler*,

821 F.2d 316, 321 (6th Cir.1987) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir.1985)).

As *Bowen* illustrates, only in more unusual situations can the failure to follow these requirements

be deemed harmless error. This is not a question over whether the ALJ's decision is supported by

substantial evidence. Rather, "[a]n agency's failure to follow its own regulations 'tends to cause

unjust discrimination and deny adequate notice' and consequently may result in a violation of an

individual's constitutional right to due process." *Wilson*, 378 F.3d at 545(quoting *Vitarelli v. Seaton*,

359 U.S. 535, 547, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959)).

1:08 CV 0249                                    6

The ALJ accepted this opinion in part to the extent is was consistent with the mental residual functional capacity assessment from the state agency physicians. (Tr. 15). Based on a consultative examination at the behest of the state agency in November 2005 by Dr. Felker, two state agency physicians reviewed Dr. Felker's report and concluded that Congin could perform jobs that do not have strict time pressures, do not require him to focus and concentrate for long periods, and do not require frequent interaction with others. (Tr. 128). In their Part I, Summary Conclusions, they marked "moderate" limitation: for maintaining schedule and attendance; performing activities within schedule; maintaining regular attendance and punctuality; completing a normal work day or work week without interruption; interacting with co-workers and supervisors; and responding appropriately to changes to work setting .(Tr. 126-27). So in effect, the ALJ accepted Dr. Gerstenhaber's mental residual functional assessment to the extent it would align with the foregoing conclusions from non-examining state agency physicians who had reviewed only a report from a consultative examination. (Tr. 15). The deficiency of this review is obvious.


The ALJ found "parts" of Dr. Gerstenhaber's opinion to be "problematic" for the following reasons:

  • The opinion that Mr. Congin could not handle any job-related stress or that he would need to miss three days per month is too restrictive, and is not even consistent with Mr. Congin's past work behavior. . . . Mr. Congin never testified, nor did he report to a treating or examining practitioner that he needed to take days off from work to deal with his symptoms.

  • The psychologist noted in his treatment records that Mr. Congin's symptoms are well controlled with medication.

  • The psychologist has only treated Mr. Congin for a short period and did not observe his behavior or follow his condition prior to January, 2006. . . . he no longer sees Mr.

1:08 CV 0249                                    7

Congin on a frequent basis, and at his last session with him, noted that Mr. Congin's condition had improved. (See Tr. 15).

Congin did testify that while he worked at Metco under family ownership he would leave work when he experienced panic attacks and go to his father's basement in the building, or his father would send him home "if it was too bad." (Tr. 158-60). These events could last for weeks. (Tr. 160). Since working under new ownership, Congin testified that he had panic attacks once or twice a week, with severe attacks about every other month. (Tr. 161).

Also contrary the second part of the findings relating to panic attacks, Congin did tell Dr. Gerstenhaber that he frequently missed weeks of work due to anxiety attacks, but it did not matter while his family owned Metco .(Tr. 133). In view of the foregoing, the ALJ provided two invalid reasons.

Next, Dr. Gerstenhaber did *not* state in his notes that Congin's symptoms are well-controlled by medication. Congin testified at the administrative hearing that psychiatrist Dr. Eden prescribed Zoloft and Clonazepam .(Tr. 155). Twice in his decision, the ALJ claimed that Dr. Gerstenhaber reported that medication controlled Congin's symptoms. The ALJ's claim appears the first time when the ALJ explained that Congin had been prescribed and taken appropriate medications and these medications had been "relatively effective" in controlling his symptoms .(Tr. 14). The ALJ reported that by April 2006 Congin's condition had improved and by June 2006 it was well-

1:08 CV 0249                                    8

controlled with medication referring to Ex. 7F. (Tr. 13). This exhibit contains no report from June

2006. (Tr. 136-39). Then later in his decision regarding Dr. Gerstenhaber, the ALJ repeats this claim

a second time.  The court is unable to find Dr. Gerstenhaber's report which states that Congin's

condition was well-controlled by medication. The Commissioner concedes error but argues that the

ALJ's support is actually from Dr. Eden's May 26, 2006 notes which appear to state "well controlled

over this period." (Tr. 141). As a result, the ALJ did in this instance offer a "good reason," but the

ALJ was careless in attributing the date and  source.


Finally, for the improvement that Dr. Gerstenhaber supposedly found, on May 23, 2006, this

psychologist noted "moderate" impact on functioning, just as he had on April 18, 2006. (Tr. 136).

Progress was reportedly "variable" and the prognosis was "guarded." (Tr. 136). The global

assessment of functioning score [GAF] declined slightly from 55 in April to 52 in May. However,

Dr. Gerstenhaber had earlier charted "severe"impact on functioning in earlier visits and assigned

GAF scores of 43 to 50 .(Tr. 137). So overall there was improvement during the final sessions in

April and May 2006. Again, the statement was a bit imprecise, but the gist of it was correct.

Accordingly, the ALJ provided two essentially correct reasons and two incorrect reasons.


The bigger issue, though, is the ALJ's failure to follow the format of 20 C.F.R. §404.1527(d).

Central to this analysis is supportability. Supportability is simply "[t]he more a medical source

presents relevant evidence to support an opinion, particularly medical signs and laboratory findings,

the more weight we will give that opinion. See 20 C.F.R. §§404.1527(d)(3) & 416.927(d)(3).  The

regulations  require that the treating physician's opinion must be "well-supported by medically

acceptable clinical and laboratory diagnostic techniques." This includes reporting : (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)). "[B]ecause nonexamining sources have no examining or treating relationship . . ., the weight [to be] give[n] their opinions will depend on the degree to which they provide supporting explanations for their opinions." §404.1527(d)(3); §416.927(d)(3). The ALJ's accepted the state agency mental residual functional capacity assessment based on a one-time consultative exam by Dr. Felker without weighing it . The ALJ chipped away at the foundation of Dr. Gerstenhaber's opinion, but never explained why Dr. Felker's opinion, through the conduit of the state agency physicians, was given more weight.

In short, the ALJ failed to provide "good reasons" for not giving more weight to th opinion from the treating psychologist, Dr. Gerstenhaber. The court cannot compensate for the ALJ's failure with its own reassessment for "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243 (citing *Wilson* 378 F.3d at 544). *Wilson* recognized three instances where the failure to give "good reasons" is  harmless error, but these are not applicable here.[2] When the Commissioner misapplies the regulations or when one of

---

[2] *Wilson* provided three examples of harmless error as where the treating physician's opinion is patently deficient that it could not possibly be credited, where the treating physician's conclusions are implicitly adopted by the ALJ, or when the procedural goal has been met although the ALJ had not complied with the terms of 20 C.F.R. §404.1527(d)(2). *Id.*, 378 F.3d at 547; and see *Bowen* 478 F.3d at 747-48.

1:08 CV 0249                                    10

the ALJ's factual findings is not supported by substantial evidence, recourse is through a remand under sentence four. See *Faucher v. Secretary of HHS*, 17 F.3d 171, 175-76 (6th Cir. 1994).

*Failure to include restrictions from state agency physicians:*

As mentioned previously, the ALJ acknowledged the three essential restrictions found by the state agency physicians that:  Congin could perform jobs that do not have strict time pressures; do not require him to focus and concentrate for long periods; and, do not require frequent interaction with others. (Tr. 14, 128). The ALJ, relies on the response to the question posed to the vocational expert when the vocational expert was asked to consider simple, repetitive tasks with minimal interaction with the public, co-workers and supervisors. (Tr. 12, 15, 170). The restriction against strict time pressures was omitted and "simple, repetitive" does not correlate with inability to concentrate for long periods or no time pressures.

The Commissioner argues that the ALJ's residual functional capacity assessment represents the melding of the assessment from the state agency physicians and Dr. Felker. Well of course there is a melding with Dr. Felker's report because the state agency physicians derived their findings from Dr. Felker's report. Their residual functional capacities were prepared prior to the reports from Dr. Gerstenhaber and Dr. Eden.  Dr. Felker reported mild impairment of ability to concentrate, and mild to moderate impairment to tolerate the stressors of employment, in addition to her conclusions concerning relating to others. (Tr. 103). Again however, this does not explain how a restriction to simple, repetitive work accounts for these non-exertional restrictions.

The restriction to "simple, repetitive" tasks is not associated with anything other than understanding and memory. The *Dictionary of Occupational Titles* under Appendix C provides "reasoning levels" under  General Education Development ("GED"), which reflects education obtained in elementary school, high school, or college required for an occupation. See *DOT*, Appendix C.  It is the "reasoning level" of an occupation that indicates whether that occupation requires only simple one or two step tasks. The *DOT* defines six different reasoning levels of jobs, varying from R1 to R6.  A reasoning level of R1 is used to designate those jobs that require the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." A reasoning level of R2 is used to describe jobs that require the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."  Case law interpreting the correlation between simple, repetitive work  holds that simple, repetitive work is inconsistent with the demands of R3 reasoning See *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (1 0th Cir. 2005); *Estrada v. Barnhart* , 417 F.Supp.2d 1299, 1303-04 (M.D.Fla.2006); *Squier v. Astrue*, 2008 WL 2537129, at *5 (C.D.Cal.); *Tudino v. Barnhart* , 2008 WL 4161443, at*10 (S.D.Cal.).


The state agency physicians found no significant restrictions with regard to understanding and memory. (Tr. 126).  On the other hand, Dr Gerstenhaber found "moderate" restriction in understanding, carrying out and remembering instructions .(Tr. 144). The ALJ's reasoning, however, clearly indicates that the ALJ was not augmenting the restrictions placed by the state agency physicians with an additional restriction from Dr. Gerstenhaber' opinion. The net effect is that the

1:08 CV 0249                                   12

residual functional capacity assessment only includes one of the three restrictions found by the state agency physicians, i.e. minimal interaction with the public, co-workers, and supervisors. (Tr. 12). The ALJ failed to include the restrictions against prolonged concentration and time quotas.

Congin next argues that the ALJ ignored that the mental residual functional capacity assessment prepared by state agency psychologists noted moderate restrictions in 6 areas including the ability to complete a normal workday without interruption .(Tr. 126-27). The Commissioner responds that the check marks indicating moderate restrictions on the mental residual functional capacity assessment in Section I did not represent the actual assessment but was merely a "worksheet" to aid in determining the degree of functional limitation. The Commissioner explains that the Social Security Administration's Program Operations Manual System (POMS) DI 24510.060 and DI 24510.060B4 clarify that "Section III Functional Capacity Assessment, is for recording the mental RFC [residual functional capacity] determination. It is in Section III that "the actual mental RFC assessment is recorded . . ." See POMS DI 24520.060(B)(2). [3]

POMS Section DI 24510.064 regarding the Completion of Section I states the box labeled "moderately limited" should be checked when the "evidence supports the conclusion that the individual's capacity to perform the activity is impaired. The degree and extent of the capacity or limitation must be described in narrative format in Section III." However, Section III should not

---

[3] The POMS is the operational reference used by SSA staff to conduct SSA's daily business. "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect . . ." *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385 (2003). The POMS is available at http://www.ssa.gov/regulations/index.htm.

1:08 CV 0249                                    13

include any "severity ratings or nonspecific qualifying terms (e.g., moderate, moderately severe) to

describe limitations. Such terms do not describe function and do not usefully convey the extent of

capacity limitation." POMS DI 24510.065. In general, the decisions have respected the

Commissioner's argument the ALJ is not required to include the findings in Section I of the

summary conclusions in the residual functional capacity assessment. See *Liggett v. Astrue*, 2009 WL

189934, *7-8 (E.D. Pa.); *Berry v. Astrue*, 2009 WL 50072, *15 (W.D.Va.); *Norris v. Astrue*, 2008

WL 4911794, *16 (E.D.N.C.); *Malueg v. Astrue*, 2007 WL 5480523 (W.D. Wis) .

However, there is a discrepancy between the POMS sections and the instructions used on the

mental residual functional capacity assessment. Section III begins with the following instruction:

> Record in this section the *elaborations to the preceding capacities*. Complete this
> section ONLY after the SUMMARY CONCLUSIONS section has been completed.
> Explain your summary conclusions in narrative form. Include any information which
> clarifies limitation or function. Be especially careful to explain conclusions that differ
> from those of treating medical sources or from the individual's allegations (emphasis
> supplied). (TR. 128).

The Commissioner has not made his rules clear to the state agency physicians who complete

this form that Section III is all-inclusive. See *Hartman v. Astrue*, 2008 WL 4089255 (W.D. Wash).

While the ALJ may believe himself to be restricted to consideration of Section III, "there is no

direction given on that form to indicate to the evaluator that he or she should treat section III as

constituting the claimant's sole and entire mental residual functional capacity." *Id.*, at *6. An

affirmative answer to the question should the ALJ's be compelled to resolve the meaning of the

written narrative in light of Section I, though, would create a tug-of-war with their responsibilities

under the POMS. A better resolution is that the ALJ looks to Section I when necessary to clarify the

1:08 CV 0249                                        14

evaluator's intended meaning in the restrictions appearing in the written narrative. See *Cook v. Astrue*,

2009 WL 302186, *6 (N.D. Ga.)(finding ALJ should have looked to Section I to ascertain evaluator's

intent).


Congin did not seek clarification of the Section III mental residual functional capacity

assessment. He argues for the acceptance of his hypothetical question to the vocational expert based

on those activities marked in Section I as moderately impaired. (See Tr. 174-75). This argument leads

to confusion because, as the POMS explained, terms as "moderate" do no accurately convey the

extent of limitation assessed by the state agency physician. See POMS DI 24510.065. Accordingly,

the ALJ cannot be faulted for not factoring in all six "moderate" limitations in assessing Congin's

mental residual functional capacity.


*Failure to properly assess credibility*:

The role of the court is not to examine the credibility of claimant's testimony or resolve

conflicting evidence but rather to determine whether substantial evidence supports the

Commissioner's determination of disability within the meaning of the Social Security Act. See

*Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). Credibility determinations track pain analysis.

See *Felisky v. Bowen*, 36 F.3d 1027, 1038-39 (6th Cir. 1997); *McCoy v. Chater*, 81 F.3d 44, 47 (6th

Cir. 1995), *cert. denied*, 518 U.S. 1022 (1996); *Walters v. Comm. of Soc. Sec.*, 127 F.3d 525, 531-32

(6th Cir. 1997); and see *Saddler v. Commissioner of Soc. Sec.*, 173 F.3d 429, 1999 WL 137621 (Table

6th Cir. March 4, 1999); 20 C.F.R. §404.1529(c)(3); §416.929(c)(3). The rule is,

> An individual's statements about the intensity and persistence of pain
> or other symptoms or about the effect the symptoms have on his or her

1:08 CV 0249                                    15

> ability to work may not be disregarded solely because they are not
> substantiated by objective medical evidence.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *1. [4]

The ALJ's discussion of this issue must contain clearly stated reasons. *Felisky v. Bowen*, 35 F.3d at 1036, citing *Auer v. Secty. of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 1987). The ALJ is not required to "expressly refer to each document in the record, piece by piece." *Coggon v. Barnhart*, 354 F.Supp.2d 40, 55 (D.Mass.2005). However, the ALJ is required to provide "specific reasons for the finding on credibility, supported by the evidence in the case record, [that] must be sufficiently specific to make clear to the individual and to any subsequent reviewer the weight the adjudicator gave to the individual's statements and the reasons for that weight[,]" aside from mere lack of substantiation by objective evidence. See SSR 96-7p, 1996 WL 374186 *1-2; *Saddler v. Commissioner of Soc. Sec.*, 173 F.3d 429, 1999 WL 137621 at *2. " It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must "build an accurate and logical bridge from the evidence to . . .the conclusion." *Id.*, 245 F.3d at 887.

The ALJ acknowledged SSR 96-7p in assessing residual functional capacity. (Tr. 12). The format set forth in SSR 96-7p outlines the administrative evaluation process beginning with traditional

---

[4] Social Security Rulings "are binding on all components of the Social Security Administration" and "represent precedent final opinions and order and statements of policy and interpretations" that have been adopted. 20 C.F.R. 402.35(b)(1). See *McClanahan v. Comm'r of Soc. Sec.* 830, 834 (6th Cir. 2006), citing *Blankenship v. Bowen*, 874 F.2d 1116, 1119 n. 9 (6th Cir. 1989).

1:08 CV 0249                               16

two-prong *Duncan* pain analysis plus the additional regulatory considerations under 20 C.F.R.

§404.1529(c)(3) and §416.929(c)(3). See *Duncan v. Sec'y of Health & Human Services*, 801 F.2d

847, 853 (6th Cir. 1986); *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).


Under the two-prong pain analysis, there first must be a determination whether there exists

an underlying medically determinable physical or mental impairment followed by the question

whether the impairment would be reasonably expected to produce the individual's pain or other

symptoms. SSR 96-7p, 1996 WL 374186 at *2. The second question then is the reasonableness of the

alleged debilitating pain or other subjective condition. The mandated considerations require the ALJ

to investigate subjective complaints of pain or other symptoms based on:

1.      The claimant's daily activities;

2.      The location, duration, frequency, and intensity of pain;

3.      Precipitating and aggravating factors;

4.      The type, dosage, effectiveness, and side-effects of medication to alleviate pain
        or other symptoms;

5.      Treatment, other than medication claimant has received for relief of pain; and

6.      Any other measures used to relieve pain (e.g. lying down or changing
        position).

7.      Other factors concerning functional limitations and restrictions due to pain
        or other symptoms.

See SSR 96-7p, 1996 WL 374186 at *2; 20 C.F.R. §404.1529(c)(3)(I-vii); §416.929(c)(3)(I-vii).


The ALJ discounted Congin's description of the severity of the intensity, persistence and

1:08 CV 0249                                17

limiting effects of his symptoms because he found them to be "not entirely credible" for four reasons::

> • Congin did not seek treatment for his impairments until 1/06, the treatment he has
> received since 1/06 has been "relatively successful," and Congin did not take any
> medication for his symptoms from 1/96 to 1/06 (TR 14).

> • Congin has described daily activities that are not "limited to the extent one would
> expect," including household chores, driving his daughter to school, preparation of
> meals and attendance to his personal hygiene (TR 14). He also maintains a "good
> relationship" with his family without interference from the symptoms of his
> impairments (TR 14).

> • Congin stopped working for reasons not related to his severe impairments, he had
> worked for decades with these impairments, and he worked for his father despite
> knowing that doing so was emotionally and mentally stressful (TR 14-15).

> • Congin's testimony was "evasive or vague at times," leaving the impression that he
> may have been less than entirely candid when describing symptoms and limitations
> (TR 15).

Congin contends that the ALJ relied upon facts that have little or no bearing on credibility and

misstated or misinterpreted other facts.  With respect to not obtaining treatment until January 2006,

Congin argues that Congin was also treated for generalized anxiety disorder at the Cleveland Clinic

from 1/27/94 to 11/8/95. Thereafter, he refrained from obtaining treatment for a number or reasons.

He reported and  testified that  he was told by his doctor, at the Cleveland Clinic that he should not

rely on medications and that "you have to do it yourself." (TR 82, 154). An additional factor is that

Congin was treated for a mental disorder when he was only 10 years old and that treatment was not

a positive experience – he was given tranquilizers that caused him to fall asleep even on his bicycle

(TR 166-167). He also testified that he has been too anxious to go to a primary physician for fear that

the doctor will tell him that he is dying of cancer (TR 162), and when told several years ago by a

doctor that he needed to be tested for diabetes, he refused to be tested because he didn't want to know

1:08 CV 0249                          18

if he was going to die .(TR 162). Congin's point is correct, "it is a questionable practice to chastise

one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."

*Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). Consequently failure to seek medical care

would not be a determinative factor in a credibility assessment. See *Strong v. Soc. Sec. Admin.*, 88

Fed. Appx. 841, 846 (6th Cir. Feb. 3, 2004).


     Congin contends that the ALJ's finding normalcy in activities of daily living is based on

selective review. Consultative psychologist Dr. Felker reported Congin's daily activities as: getting

up at 6 am; washing, getting dressed, and eating cereal; possibly making some toast for his wife and

daughter; taking his daughter to school; doing chores because he likes to keep the house "neat and

orderly"; doing errands; going for a ride in the car if he is very anxious; making some dinner

preparations (although his wife cooks the meals and shops for groceries); cleaning or straightening

up some more; and going to bed between 10 and 11 pm (TR 103). Dr. Felker reported that Congin

does not enjoy watching television, does not attend any religious services, limits his reading to only

the sports page, has no hobbies, and has always been preoccupied with work. (TR 103). Congin

argues that Dr. Felker found aspect of obsessive-compulsive disorder based on daily activities.

However, The state agency physicians found "mild" restriction of daily activities based on Dr.

Felker's report. (Tr. 122). Ordinarily one could argue that the ALJ erred in "double counting" the

evidence of daily activities used under both the "B-criteria" of the mental impairment listings in

assessing the severity of mental impairment and again in his assessment of credibility for "[i]t, in

effect, readdresses the *Duncan* analysis, where reasonableness of complaints in light of medical

evidence has already be assayed." *Blankenship v. Bowen*, 874 F.2d at 1124. However, SSR 96-7p very

1:08 CV 0249                                    19

specifically requires assessing the credibility of an individual's statements in relation to that individual's daily activities. The ALJ did not err, and "mild" restriction is supported by substantial evidence.

Congin states that discrediting him for the reason he stopped working was not due to his impairment is contrived. There is no nexus between cessation of employment by new management and Congin's credibility. As Congin argues the fact that he was terminated does not undercut his claim that he was unable to engage in competitive employment after he was terminated.

Finally, Congin argues that the ALJ failed to elaborate on what he meant by the remark that Congin's testimony was evasive and vague. The ALJ is required to provide "specific reasons for the finding on credibility, supported by the evidence in the case record, [that] must be sufficiently specific to make clear to the individual and to any subsequent reviewer the weight the adjudicator gave to the individual's statements and the reasons for that weight." See SSR 96-7p, 1996 WL 374186, *1-2. The ALJ's subjective belief that the testimony was evasive is not supported by reference to the record, and does not suffice under SSR 96-7p.

*Remand*:

Congin correctly argues that the ALJ's decision was not supported by substantial evidence and is contrary to Social Security Administration regulations and rulings as well as the case law of the Sixth Circuit. Congin seeks a court order reversing and remanding the Commissioner's decision and awarding benefits. The Commissioner raises no counter-argument. In this circuit, the Commissioner's

1:08 CV 0249                                        20

decision may be reversed and benefits awarded only when the Commissioner's decision is clearly

erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the

contrary is lacking. *Newkirk v. Shalala*, 25 F.3d 316 (6th Cir. 1994); *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985); and see *Lashley v.

Secretary*, 708 F.2d 1049 (6th Cir. 1983). Accordingly "all essential factual issues" must be resolved

and there must be a "clear entitlement to benefits on the record as it now stands." *Faucher*, 17 F.3d at

176.


These requirements are met. The ALJ omitted the fact in his determination that he questioned

the vocational expert concerning all three areas of restriction appearing under Section III of the state

agency physicians' mental residual functional capacity assessment. The ALJ acknowledged the three

essential restrictions found by the state agency physicians that Congin could perform jobs that do not

have strict time pressures, do not require him to focus and concentrate for long periods, and do not

require frequent interaction with others. (Tr. 14, 128). The ALJ found, "This opinion is consistent with

the overall evidence." (Tr. 14). In questioning the vocational expert, the ALJ asked the vocational expert

to consider minimal interaction with the public, co-workers, and supervisors and limited to low stress

work with no production quotas .(Tr. 171). Apparently, this was the ALJ's quantification of Congin's

attention and concentration deficits. The expert's response was that of previously identified jobs, the job

of housekeeping cleaner remained. The ALJ next added the constraint of no strict time pressures, and

the expert responded that there were no jobs. (Tr. 171).


The current record and the ALJ's adoption of the mental residual functional capacity

assessment from the state agency physicians obviates any need for consideration of the conflict

1:08 CV 0249                                        21

between Dr. Felker's opinion and Dr. Gerstenhaber's, vocational consideration of all parts of the

Section III conclusions from the state agency physicians plus any that may be adopted from Dr.

Gerstenhaber's July 2006 opinion, or reassessment of Congin's credibility in accordance with SSR

96-7p. All restrictions assessed by the state agency physicians under Section III were considered by the

vocational expert, and   the opinion was that no jobs remained within these constraints.

Consequently,"all essential factual issues" were resolved in the current record and remand under the

fourth sentence of 42 U. S. C. §405(g) is unnecessary to reevaluate other aspects of the determination

where the ALJ's analysis was deficient.


## CONCLUSION

For the foregoing reasons based on the arguments presented, the record in this matter and

applicable law, the undersigned finds that the Commissioner's decision denying disability insurance

benefits was not supported by substantial evidence and is reversed and remanded for the award and

calculation of benefits.


_____s/James S. Gallas_____
United States Magistrate Judge

Dated: March 18, 2009

1:08 CV 0249                        22